UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ELECTRONICALLY FILED |
| | ) | Oct 26 2018 |
| Plaintiff, | ) | U.S. DISTRICT COURT |
| | ) | Northern District of WV |
| v. | ) | |
| | ) | |
| BIAFORA'S INCORPORATED d/b/a | ) | |
| METRO PROPERTY MANAGEMENT; | ) | Civil Action No. __1:18-CV-201 (Keeley)__ |
| RDR PROPERTIES, LLC and RDR | ) | |
| PROPERTIES II, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

The United States of America ("United States") alleges as follows:

NATURE OF THE ACTION

1. The United States brings this action to enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq*. ("Fair Housing Act" or "FHA"). This action is brought under 42 U.S.C. § 3612(o) on behalf of Chelsea Hill, Gabrielle Sheppard, Northern West Virginia Center for Independent Living and the Fair Housing Partnership of Greater Pittsburgh.

JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 3612(o).

3. Venue is proper under 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims occurred in the Northern District of West Virginia and the Defendants reside and do business within this judicial district.

PARTIES AND PROPERTIES

4. Defendant Biafora's Incorporated, d/b/a Metro Property Management ("Biafora's/MPM") is a corporation organized under the laws of West Virginia, with its principal place of business located at 6200 Mid-Atlantic Drive, Morgantown, West Virginia 26508. Biafora's/MPM is engaged in the business of managing, operating, and acquiring real estate. Biafora's/MPM manages multifamily residential properties under its trade name, Metro Property Management.

5. Defendant RDR Properties, LLC ("RDR"), is a limited liability company organized under the laws of West Virginia, with its principal place of business at 6200 Mid-Atlantic Drive, Morgantown, West Virginia 26508. RDR owns Glenlock South, a 40-unit residential apartment complex located at 2040 University Avenue, Morgantown, West Virginia 26505.

6. Defendant RDR Properties II, LLC ("RDR II") is a limited liability company organized under the laws of West Virginia, with its principal place of business at 6200 Mid-Atlantic Drive, Morgantown, West Virginia 26508. RDR II owns Valley View Woods, a 73-unit residential apartment complex located on Valley View Avenue in Morgantown, West Virginia 26505.

7. At all times relevant to the complaint, Biafora's/MPM was responsible for the operation and management of Glenlock South and Valley View Woods.

8. The housing units at residential properties owned or managed by the Defendants are "dwelling[s]" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

## FACTUAL ALLEGATIONS

**HUD Complainants**

9. At all times relevant to the complaint, Chelsea Hill is and has been a person with a disability as defined by the Fair Housing Act, 42 U.S.C. § 3602(h). She suffers from depression and anorexia nervosa, conditions that substantially limit her in the major life activities of eating, working, learning, caring for one's self and engaging in social interactions. Ms. Hill lived at Glenlock South from May 2015 to May 2016.

10. At all times relevant to the complaint, Gabrielle Sheppard is and has been a person with a disability as defined by the Fair Housing Act, 42 U.S.C. § 3602(h). She suffers from an anxiety disorder that substantially limits her in the major life activities of working, learning, and engaging in social interactions. Ms. Sheppard lived at Valley View Woods from August 2015 to August 2016.

11. Northern West Virginia Center for Independent Living ("NWVCIL") is a non-profit corporation based in Morgantown, West Virginia. NWVCIL is an advocacy resource center for persons with disabilities.

12. Fair Housing Partnership of Greater Pittsburgh, Inc. ("FHP") is a non-profit corporation based in Pittsburgh, Pennsylvania. FHP's organizational mission is to create, promote, and support equal housing choice and opportunity through fair housing advocacy, housing discrimination testing, and comprehensive housing counseling services.

**Defendants' Policies and Forms**

13. Biafora's/MPM created the pet policies, reasonable accommodation policies and applicable forms for Glenlock South and Valley View Woods.

14. At Glenlock South, tenants are not allowed to keep pets in their apartments.

15. At Valley View Woods, tenants are allowed to keep cats or dogs as pets, subject to certain age, weight and breed restrictions. Tenants with pets are required to sign a "Pet Lease" and pay a nonrefundable pet fee of $200.00 per pet and an additional monthly fee of $35.00 per pet. Tenants must also complete a pet information form and must provide Biafora's/MPM with a photo of the animal and a vaccination record.

16. At Glenlock South and Valley View Woods, a tenant who is found to have an unauthorized animal on the premises immediately forfeits his or her security deposit and must pay a replacement security deposit.

17. Biafora's/MPM requires that all residents who request to be allowed to keep an emotional support animal as a reasonable accommodation fill out a series of forms and provide a letter from a medical professional attesting to their disability-related need for an emotional support animal. Biafora's/MPM distributes the required forms to residents as a part of a packet (referred to herein as the "Emotional Support Animal Packet" or "ESA Packet").

18. At the time that Ms. Hill and Ms. Sheppard made their requests for a reasonable accommodation, the ESA Packet included the following documents:

    a. a letter addressed to the resident giving general information, warnings and instructions about the required paperwork (the "Resident Letter");

  b. a form addressed to the resident's "Medical Professional" that required that the medical professional sign and notarize a statement attesting that "the information provided in the attached letter is true" (the "Verification Form");

  c. a document entitled "Doctor's Sample Letter for Emotional Support Dog" (the "First Sample Letter");

  d. a document entitled "Sample Letter for Emotional Support Animal" (the "Second Sample Letter"); and

  e. a form that required the resident to provide information about the emotional support animal the resident wishes to keep, including its name, age, breed and emergency contact information (the "Information Form").

19. The Resident Letter advised applicants that: "[f]or a person to legally qualify for an emotional support animal (ESA) he/she must be considered emotionally disabled by a licensed mental health professional (therapist, psychologist, psychiatrist, etc.), as evidenced by a properly formatted prescription letter.  A medical doctor does not qualify because they are not a licensed mental health professional."

20. The Resident Letter further stated that: "[i]f you are claiming a dog as a service dog when you are not disabled or the dog is not trained it can cost you future benefits; [sic] such as social security even when you would normally quality [sic] (i.e. when you retire). In some states, it is also a criminal offense that can result in finds [sic] over $50,000 and/or jail time. (paraphrased from ADA, service dogs)[.]"

21. The Resident Letter instructed applicants to have their "medical professional provide [Biafora's/MPM] all the required paperwork included in this packet" and stipulated that

the letter from their medical professional "must be dated, written on his/her letterhead, include his/her license type, number, date of license, and state in which the license was issued."

22. The Verification Form was addressed to the applicant's "medical professional" and instructed the medical professional to provide Biafora's/MPM "with a letter, on your letterhead, following the guidelines of the enclosed sample letter that must be signed below and have your signature notorized [sic]."

23. At the bottom of the Verification Form, the applicant's medical professional was instructed to sign the following statement before a notary: "I hereby attest that the information stated in the attached letter is true."

24. The Verification Form warned the applicant's medical professional that the "information provided by you regarding your patient may be subject to further scrutiny. if [sic] this issue goes to court, the doctor providing this information will be subject to a subpoena for his/her medical records and to testify in court."

**Denial of Chelsea Hill's Reasonable Accommodation Request**

25. On or about February 6, 2015, Chelsea Hill, signed a lease for an apartment at Glenlock South for the term of May 16, 2015 to May 6, 2016 and paid a $250.00 security deposit.

26. Ms. Hill's lease included a list of "Rules and Regulations Respecting Leased Premises" that provided that "[n]o animals or pets shall be kept in the premises, no matter how short the amount of time . . . [a]ny violation will result in loss of TENANTS [sic] security deposit, and possible immediate eviction."

27. In or around April 2015, Ms. Hill contacted Biafora's/MPM to ask if she would be allowed to keep an emotional support animal in the apartment.

6

28. On or about April 28, 2015, Ms. Hill received an email response from Biafora's/MPM stating:

> There is no additional charge for a service animal. In order to qualify, you must fill out the attached paperwork, complete each task, and have each form notarized. Please send all original forms to our office or drop them off at some point. The only restriction is that the dog must be from a non-aggressive breed. Please call or email us with any further questions.

Attached to the email was a copy of the ESA Packet.

29. On or about May 16, 2015, Ms. Hill moved into Glenlock South. On the move-in inspection checklist, in the space marked "Pet Permit," Ms. Hill circled "DOG" and wrote next to it the words "companionship animal."

30. On or about May 25, 2015, Ms. Hill acquired an emotional support animal and brought the animal to live with her in her apartment.

31. On or about May 26, 2015, Ms. Hill submitted her completed ESA Packet to Biafora's/MPM. Ms. Hill also submitted a letter from her counselor that provided information about her disability and explained her need for an emotional support animal.

32. On or about June 15, 2015, a Biafora's/MPM employee contacted Ms. Hill and told her that she needed her counselor's signature to be notarized by June 22, 2015, or Ms. Hill would forfeit her security deposit.

33. As Ms. Hill was out-of-town for more than a week, she explained to the employee that she would be unable to get her counselor's notarized signature immediately.

34. On or about June 24, 2015, Ms. Hill contacted her counselor's office to request that her counselor have her signature on the letter notarized. Ms. Hill was informed that her counselor was out on vacation.

7

35. On or about June 24, 2015, a Biafora's/MPM employee again contacted Ms. Hill to demand that she submit her counselor's notarized signature on the Verification Form by the close of business that day.

36. On or about June 25, 2015, Ms. Hill received a "Pet Violation" letter from Biafora's/MPM demanding that she remove her dog from the apartment immediately or she would face eviction proceedings. The letter stated that because Ms. Hill had an unauthorized animal in the apartment, she had forfeited her initial security deposit of $250.00 and must pay a new security deposit in the amount of $250.00.

37. On or about June 26, 2015, Ms. Hill's father wrote a $250.00 check to Biafora's/MPM for the new security deposit.

38. On or about July 2, 2015, Ms. Hill and her father met with a Biafora's/MPM employee to discuss her request for a reasonable accommodation. During the meeting, Ms. Hill gave the employee a second letter from her counselor which included additional information about Ms. Hill's disability and her need for an emotional support animal. During the meeting, the employee told Ms. Hill and her father that Biafora's/MPM would not accept the letter from Ms. Hill's counselor – a licensed clinical social worker and certified counselor – because Biafora's/MPM had determined that the counselor did not qualify as a "licensed mental health professional." The employee told Ms. Hill that the animal would have to be removed from the apartment that day or Ms. Hill would be evicted.

39. On or about July 2, 2015, Ms. Hill removed her emotional support animal from the apartment.

40. After the emotional support animal was removed from the apartment, Ms. Hill's symptoms of depression increased. During this period, Ms. Hill's increased stress and

depression made it more difficult for her to eat, work, learn, care for herself and engage in social interactions.

41. On or about July 30, 2015, Ms. Hill's mother sent an email to Biafora's/MPM expressing concern over Biafora's/MPM's denial of Ms. Hill's reasonable accommodation request. In the email, Ms. Hill's mother noted that her "daughter has now been without her authorized companion animal for more than three weeks" and "is suffering worse symptoms of her disability[.]"

42. On or about August 4, 2015, a Biafora's/MPM employee sent an email to Ms. Hill's mother informing her that "after further discussion and review, [Ms. Hill] is allowed to have her dog reside with her in the unit."

43. On or about August 4, 2015, Ms. Hill filed a housing discrimination complaint with HUD alleging that Biafora's/MPM and RDR had violated the Fair Housing Act by discriminating against her on the basis of her disability.

44. On or about May 6, 2016, Ms. Hill moved out of Glenlock South.

45. Upon information and belief, Biafora's/MPM did not refund Ms. Hill's initial security deposit of $250.00.

**Denial of Gabrielle Sheppard's Reasonable Accommodation Request**

46. In the summer of 2015, Gabrielle Sheppard contacted Biafora's/MPM by telephone to arrange for a tour of available apartments at Valley View Woods.

47. During that call, Ms. Sheppard asked a Biafora's/MPM employee if she would be allowed to have her dog, a Doberman Pinscher, live with her as an emotional support animal. The employee stated that the dog would not be permitted on the property because it was an "aggressive breed."

9

48. On or about August 7, 2015, Ms. Sheppard signed a one-year lease for an apartment at Valley View Woods and paid a security deposit of $250.00.

49. Ms. Sheppard's lease provided that unless the tenant signs an approved Pet Lease, "[n]o animals or pets shall be kept in or about the premise . . . [a]ny violation will result in loss of TENANTS [sic] security deposit, and possible immediate eviction.  Furthermore, TENANT will be required to pay a new security deposit and remove the pet from the premises immediately upon demand."

50. On or about August 14, 2015, Ms. Sheppard moved into her apartment at Valley View Woods.

51. Shortly after moving in, Ms. Sheppard adopted a dog, a beagle-dachshund mix, to be used as an emotional support animal, and brought the animal to live with her in her apartment.

52. On or about October 1, 2015, Biafora's/MPM sent Ms. Sheppard a letter stating that, "due to the unauthorized dog in your apartment, you have lost your security deposit. Our records indicate that you do not have a signed pet lease permitting you to have any animals within the apartment . . . The dog MUST BE REMOVED from the premises within the next 24 hours.  If the dog is found still living in the apartment you will face court proceedings for IMMEDIATE EVICTION . . . As per Metro Property Management policies, a new security deposit in the amount of $250.00 MUST also be paid IMMEDIATELY in addition to any late charges that may accrue."

53. After receiving the letter from Biafora's/MPM, Ms. Sheppard contacted Biafora's/MPM and told them her dog was an emotional support animal.

10

54. A Biafora's/MPM employee told Ms. Sheppard that she would need to submit a letter from her medical provider and fill out the appropriate paperwork in order for Biafora/MPM to approve her request to keep an emotional support animal.

55. Ms. Sheppard went to Biafora's/MPM's management office and was given a copy of the ESA Packet.

56. On or about October 12, 2015, Ms. Sheppard submitted her completed ESA Packet and a letter from her primary care provider to Biafora's/MPM. The letter from Ms. Sheppard's primary care provider included information about her disability and her need for an emotional support animal.

57. After Ms. Sheppard had provided the completed ESA Packet and letter from her primary care provider to Biafora's/MPM, Biafora's/MPM told Ms. Sheppard that she would need to get her primary care provider's notarized signature on the Verification Form.

58. On November 5, 2015, Ms. Sheppard's primary care provider was able to have a notary come to her office to notarize her signature on the Verification Form. Ms. Sheppard was charged an additional fee for notarization.

59. On or about November 10, 2015, Ms. Sheppard submitted the notarized Verification Form to Biafora's/MPM.

60. On or about November 11, 2015, Biafora's/MPM sent Ms. Sheppard a letter informing her that her request for an emotional support animal had been denied.

61. In the November 11, 2015 letter, Biafora's/MPM explained that the primary care provider who had provided the letter and signed the verification form was a Certified Registered Nurse Practitioner and "Certified Registered Nurse Practitioners are not under the list of medical professionals we accept paperwork from when it comes to these types of animals." The letter

also noted that "there will be no further review of this request." Biafora's/MPM demanded that Ms. Sheppard remove the dog from the unit within the next 24 hours.

62.    In a separate letter also dated November 11, 2015, Biafora's/MPM demanded that Ms. Sheppard immediately pay a new security deposit of $250.00 along with a $31.00 late fee.

63.    After receiving the letter denying her request for a reasonable accommodation, Ms. Sheppard removed her emotional support animal from the apartment.

64.    On November 18, 2015, Biafora's/MPM sent Ms. Sheppard a letter noting that she had failed to pay the delinquent balance on her account in the amount of $281.00. Biafora's/MPM stated that "[f]ailure to resolve this past due account within 48 hours will result in default of your account to EVICTION STATUS and eviction proceedings will begin immediately."

65.    On November 20, 2015, Biafora's/MPM sent Ms. Sheppard another letter entitled "FINAL NOTICE 24 Hour – Eviction Notice" noting the outstanding balance due of $281.00. The letter stated that if payment is not received within 24 hours, "a Petition for Summary Relief: Wrongful Occupation of Residential Rental Property will be filed with your local Magistrate Court."

66.    Shortly after receiving the November 20, 2015 notice, Ms. Sheppard borrowed money from a family member to pay the additional security deposit and late fee.

67.    After her emotional support animal was removed from the apartment, Ms. Sheppard's anxiety symptoms increased and she was prescribed an anti-anxiety medication. During this period, Ms. Sheppard's increased stress and anxiety made it more difficult for her to work, learn, and engage in social interactions.

68. On or about January 6, 2016, Ms. Sheppard filed a housing discrimination complaint with HUD alleging that Biafora's/MPM had violated the Fair Housing Act by discriminating against her on the basis of her disability.

69. On February 17, 2016, Biafora's/MPM sent a letter to Ms. Sheppard informing her that her request for an emotional support animal had been re-evaluated and that she would now be allowed to have a dog in her apartment.

70. On or about August 6, 2016, Ms. Sheppard moved out of Valley View Woods.

71. Upon information and belief, Biafora's/MPM did not refund Ms. Sheppard's initial security deposit of $250.00 or the late fee of $31.00.

72. On or about August 30, 2017, Ms. Sheppard amended her complaint to name RDR II as a respondent.

**Investigation By NWVCIL and FHP**

73. In or around October 2014, NWVCIL received two telephone complaints from residents of properties managed by Biafora's/MPM.

74. The first resident told NWVCIL that Biafora's/MPM had denied her request for a reasonable accommodation to keep an emotional support animal. She reported that Biafora's/MPM had denied her request because the letter she had submitted in support of her request was from an out-of-state healthcare provider.

75. The second resident told NWVCIL that Biafora's/MPM had denied his request for a reasonable accommodation to keep an emotional support animal. He reported that Biafora's/MPM denied his request because an employee stated that his support dog, a German Shepherd, was considered an "aggressive breed."

13

76. After receiving these complaints, NWVCIL decided to conduct testing to determine whether Biafora's/MPM was discriminating on the basis of disability by denying requests for reasonable accommodation.

77. NWVCIL contacted FHP and requested that FHP provide technical assistance with testing at Biafora's/MPM's leasing offices.

78. In or around February 2015, FHP conducted a series of telephone tests by making phone calls to Biafora's/MPM's leasing offices. Each test was structured as a "matched-pair" test with a "protected tester," who requested a reasonable accommodation for an emotional support animal and asked about emotional support animal policies and a "control tester" who did not ask for a reasonable accommodation.

79. During the tests, Biafora's/MPM emailed one of FHP's protected testers a copy of the ESA Packet.

80. On or about June 25, 2015, Chelsea Hill contacted NWVCIL to ask for assistance with her request for a reasonable accommodation to be allowed to keep an emotional support animal. NWVCIL counseled Ms. Hill and assisted her with drafting and filing a HUD complaint against Biafora's/MPM and RDR.

81. On or about October 5, 2015, Gabrielle Sheppard contacted NWVCIL for assistance with her request for an emotional support animal. After Ms. Sheppard's reasonable accommodation request was denied by Biafora's/MPM, NWVCIL assisted Ms. Sheppard with drafting and filing a HUD complaint against Biafora's/MPM and RDR II.

82. In or around October and November 2015, NWVCIL conducted an additional in-person test at Valley View Woods. During this test, a Biafora's/MPM employee provided the protected tester with a copy of the ESA Packet. The employee also told the tester that any letter

supporting a request for an emotional assistance animal must be must be signed by a doctor. She stated that a letter signed by a counselor at WVU "does not count" and that she has "had people try."

83. As a result of Defendants' discriminatory conduct, NWVCIL and FHP expended staff time and other resources conducting testing regarding properties managed by Biafora's/MPM, responding to Ms. Hill's and Ms. Sheppard's complaints, and taking other actions to combat and redress the discriminatory conduct.

HUD COMPLAINT AND CHARGE OF DISCRIMINATION

84. On or about March 30, 2015, FHP and NWVCIL filed a timely complaint with HUD based on the testing they conducted alleging that Biafora's/MPM's policies discriminated on the basis of disability in violation of the Fair Housing Act. On or about August 30, 2017, FHP and NWVCIL amended their complaint to add RDR and RDR II as respondents.

85. On or about August 4, 2015, Chelsea Hill filed a timely complaint with HUD alleging that Biafora's/MPM and RDR violated the Fair Housing Act by discriminating against her on the basis of her disability.

86. On or about January 6, 2016, Gabrielle Sheppard filed a timely complaint with HUD alleging that Biafora's/MPM violated the Fair Housing Act by discriminating against her on the basis of her disability. On or about August 30, 2017, Ms. Sheppard amended her complaint to name RDR II as a respondent.

87. As required by 42 U.S.C. §§ 3610(a) and (b), the Secretary of HUD ("the Secretary") conducted and completed an investigation of the complaints filed by FHP, NWVCIL, Ms. Hill and Ms. Sheppard, attempted conciliation (without success), and prepared a final investigative report. Based on information gathered during the investigation, the Secretary,

pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause exists to believe that discriminatory housing practices had occurred.

88. On or about September 29, 2017, the Secretary issued a Determination of Reasonable Cause and Charge of Discrimination pursuant to 42 U.S.C. § 3610(g)(2)(A), charging the Defendants with engaging in discriminatory housing practices in violation of the Fair Housing Act.

89. On or about October 13, 2017, the Defendants elected to have the Charge of Discrimination resolved in a civil action filed in federal district court pursuant to 42 U.S.C. § 3612(a).

90. Following the Notice of Election, the Secretary authorized the Attorney General to commence this civil action pursuant to 42 U.S.C. § 3612(o).

91. The United States and Defendants have executed a series of agreements suspending the applicable statute of limitations for filing any cause of action under the Fair Housing Act.

92. On August 10, 2018, Counsel for NWVCIL informed the United States that NWVCIL "does not wish to remain a part of this case."

## VIOLATIONS OF THE FAIR HOUSING ACT

### COUNT I

93. Plaintiff re-alleges and incorporates by reference the allegations set forth above.

94. By the actions set forth above, Defendants have:

   a. Discriminated in the terms, conditions or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of disability, in violation of 42 U.S.C. § 3604(f)(2);

    b. Refused to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford complainants an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B);

    c. Made, printed, published, or caused to be made, printed, or published, statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability in violation of 42 U.S.C.§ 3604(c); and

    d. Coerced, intimidated, threatened, or interfered with a person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, rights granted or protected by section 804 of the FHA, in violation of 42 U.S.C. § 3617.

95. As a result of Biafora's/MPM and RDR's conduct, Chelsea Hill has been injured and is an "aggrieved person" as defined by 42 U.S.C. § 3602(i).

96. As a result of Biafora's/MPM and RDR II's conduct, Gabrielle Sheppard has been injured and is an "aggrieved person" as defined by 42 U.S.C. § 3602(i).

97. As a result of Defendants' conduct, FHP has been injured and is an "aggrieved person" as defined by 42 U.S.C. § 3602(i).

98. The discriminatory actions and practices of the Defendants were intentional, willful, and taken in reckless disregard of the rights of others.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States of America prays for relief as follows:

17

1. A declaration that the discriminatory conduct of Defendants as set forth above violates the Fair Housing Act;

2. An injunction against Defendants, their agents, employees, successors, and all other persons in active concert or participation with any of them from:

    a. Discriminating on the basis of disability, in violation of the Fair Housing Act;

    b. Stating any preference, limitation or discrimination based on disability in violation of 42 U.S.C. § 3604(c);

    c. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Chelsea Hill and Gabrielle Sheppard to the position they would have been in but for the discriminatory conduct; and

    c. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices; and

3. An award of monetary damages to Chelsea Hill and Gabrielle Sheppard pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1).

The United States further prays for such additional relief as the interests of justice may require.

Dated: October 26, 2018

|  |  |
|---|---|
|  | JEFFERSON B. SESSIONS, III<br>Attorney General |
| WILLIAM J. POWELL<br>United States Attorney<br>Northern District of West Virginia | JOHN M. GORE<br>Acting Assistant Attorney General<br>Civil Rights Division |
|  | SAMEENA SHINA MAJEED<br>Chief |
| /s/ Helen C. Altmeyer<br>HELEN C. ALTMEYER<br>W. Va. Bar No. 117<br>Assistant United States Attorney<br>Civil Division Chief<br>United States Attorney's Office<br>Suite 3000<br>1125 Chapline Street<br>Wheeling, WV 26003<br>Tel.: (304) 234-0100<br>Fax: (304) 234-0112<br>Email: Helen.Altmeyer@usdoj.gov | CATHERINE A. BENDOR<br>Deputy Chief<br><br>/s/ Audrey M. Yap<br>AUDREY M. YAP<br>Trial Attorney<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W. – NWB<br>Washington, D.C. 20530<br>Tel: (202) 305-0015<br>Fax: (202) 514-1116<br>Email: Audrey.Yap@usdoj.gov |
|  | Attorneys for Plaintiff<br>United States of America |

19

JS 44 (Rev. 08/18)           **CIVIL COVER SHEET**     1:18-CV-201    Received: 10/26/2018

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Helen Campbell Altmeyer, AUSA, WV Bar #117, U.S. Attorney's Office, P.O. Box 591, Wheeling, WV 26003 Phone: 304-234-0100 Fax: 304-234-0112 Email: Helen.Altmeyer@usdoj.gov

## DEFENDANTS
BIAFORA'S INCORPORATED dba METRO PROPERTY MANAGEMENT; RDR PROPERTIES, LLC; RDR PROPERTIES II, LLC

County of Residence of First Listed Defendant: Monongalia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | [X] 443 Housing/ Accommodations / ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 3601-3631.
Brief description of cause:
Discrimination on the basis of disability under the Fair Housing Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE 10/26/2018     SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____